621 A.2d 1276 (1993)
In re M.M., Juvenile.
No. 92-068.
Supreme Court of Vermont.
January 15, 1993.
*1277 Jeffrey L. Amestoy, Atty. Gen., Montpelier, and Martha Csala, Asst. Atty. Gen., and Keith Aten, Law Clerk on the brief, Waterbury, for plaintiff-appellee.
Charles Martin and Gerald Tallman, Law Clerk on the brief, of Martin & Paolini, Barre, for defendant-appellant.
Before ALLEN, C.J., GIBSON, DOOLEY and JOHNSON, JJ.
*1278 JOHNSON, Justice.
Appellant, mother of the juvenile, M.M., appeals an order of the Vermont Family Court of Orange County granting the petition of the Commissioner of Social and Rehabilitation Services (SRS) to terminate residual parental rights. Appellant claims that the trial court erred in finding there was a substantial change in material circumstances and in finding that the best interests of M.M. required termination of all parental rights. She argues that her parental rights were prematurely terminated in response to a false sense of "perceived urgency" created by SRS. We affirm.
M.M. was born on August 5, 1988, when appellant was fourteen years old. M.M. was first brought to the attention of SRS on April 2, 1990, when appellant's grandmother gave the police photographs showing M.M. with two black eyes. On April 5, 1990, M.M. was placed in SRS custody pursuant to a temporary detention order. Appellant claimed that the injuries were caused by a fall and denied that her husband, who was not M.M.'s biological father, had abused M.M. On May 3, 1990, the court found M.M. to be a child in need of care and supervision. The court based its conclusion upon findings that M.M.'s stepfather had physically abused her, thereby causing the black eyes; that appellant failed to protect M.M. from abuse; and that appellant did not seek medical care for M.M. The court also found that appellant was a poor caretaker of M.M. and that M.M.'s legal guardian, appellant's father, also failed to protect her and was uncooperative with authorities seeking to protect her.
At a disposition hearing, held July 9, 1990, legal guardianship and custody of M.M. was transferred to SRS, with residual parental rights and responsibilities remaining with appellant. The court further ordered that M.M.'s stepfather have no further contact with M.M. after finding that, in addition to physically abusing M.M., he had previously abused his own eighteen-month-old daughter, M.G., and that an outstanding court order barred him from any contact with her. The court also approved SRS's plan of services for the family, which had as its goal reunification of appellant and M.M. SRS's plan enumerated several steps and programs that appellant would have to complete before custody could be restored, including counselling programs, stabilization of her economic and living situation, and regular visits with M.M.
SRS's case goal remained reunification until the July 1991 eighteen-month review, when the goal was changed to termination of parental rights (TPR) and adoption of M.M. by her foster family. SRS providers determined in the eighteen-month evaluation that appellant required at least twelve to eighteen months more of continued counselling before reunification could even be considered. That determination was based on many factors, including the following: basic parenting skills had not been learned and safety and protection concerns had not been adequately addressed; appellant had separated from and reconciled numerous times with her husband, who had spent time in prison, abused his own infant daughter, abused M.M., and was physically abusive to appellant herself; appellant continued to support her husband's denial of having abused M.M., which greatly put in doubt her ability to protect M.M. in the future; the risk of potential substance abuse was considered high and a major risk factor for future abuse of M.M.
At the same time, Dr. Racusin, who performed psychiatric evaluations of both M.M. and appellant, determined that if reunification could not safely occur within one to two months, M.M.'s foster placement should become permanent "if she is to be spared from unacceptable psychological trauma." SRS providers were all in agreement that M.M.'s situation needed to be stabilized within the next one to two months and that appellant would not be able to adequately care for and protect M.M. at any time in the near future. Thus, they unanimously recommended TPR. Despite appellant's "demonstrated investment in the reunification plan," SRS service providers were all in agreement that she was still unable to provide for M.M.'s safety, care and nurture.
*1279 The family court made further findings of fact regarding appellant's situation after the eighteen month evaluation up until the date of the court's order, December 31, 1991. By December 1991, appellant had moved more than eighteen times, and, during parts of that time, her moves were so erratic and frequent that it was difficult, and at times impossible, to locate her. Appellant was not currently employed nor was she seeking employment or employment-related training, and she had resisted such training in the past. Appellant was dependent on others for transportation and had not attempted to obtain a driver's license. Even though SRS provided bus vouchers to use to visit M.M., appellant was unable to remember on several occasions to call SRS the Friday before a Monday visit to confirm that she would be arriving at the bus station, and therefore missed the meetings. Although appellant and her husband were living apart, they had not filed for divorce. She was then living with a man who also had a criminal record, who was known to be physically abusive, and who was an untreated alcoholic. They did not have a steady home.
On December 31, 1991, the family court granted SRS's petition, thereby terminating appellant's residual parental rights and transferring legal custody and guardianship, without limitation as to adoption, to SRS. The present appeal ensued.
Vermont law requires that courts employ a two-step analysis in determining whether to terminate residual parental rights. See In re J.H., 156 Vt. 66, 68-69, 587 A.2d 1009, 1011 (1991); In re H.A., 153 Vt. 504, 514, 572 A.2d 884, 890 (1990) (interpreting the former 33 V.S.A. §§ 659, 667, currently found at §§ 5532(a), 5540). First, to modify an existing disposition order, the court must find "that changed circumstances so require in the best interests of the child." 33 V.S.A. § 5532(a). The proponent of the modification must show the change to be a "substantial change in material circumstances" so as to warrant modification. In re J.H., 156 Vt. at 71, 587 A.2d at 1012. Second, the court must determine whether the best interests of the child, as set out by 33 V.S.A. § 5540, require that all parental rights and responsibilities be terminated. Id. at 68-69, 587 A.2d at 1011. Appellant claims the trial court failed to properly evaluate M.M.'s case under either step of the required analysis. We disagree.
A substantial change in material circumstances is "most often found when the parent's ability to care properly for the child has either stagnated or deteriorated." In re H.A., 153 Vt. at 515, 572 A.2d at 890. "Stagnation" can be shown by "the passage of time with no improvement in parental capacity to care properly for the child." In re J.R., 153 Vt. 85, 99, 570 A.2d 154, 161 (1989). The court's finding that a parent will be unlikely to resume his or her parental duties within a reasonable time must be supported by clear and convincing evidence. In re H.A., 153 Vt. at 513, 572 A.2d at 889. An explicit finding of changed circumstances is not required to uphold a modification order; "[r]ather, the changed circumstances test is met when the findings in the case are `replete with facts sufficient to meet the required standard.'" Id. at 515, 572 A.2d at 890 (quoting In re C.L., 151 Vt. 480, 483, 563 A.2d 241, 243-44 (1989)). The court's findings will be upheld unless clearly erroneous, and its conclusions will be affirmed if supported by the findings. In re H.A., 153 Vt. at 515, 572 A.2d at 890.
Here, the trial court made numerous findings regarding appellant's participation in the programs required by the reunification plan and regarding her inability to resume care for M.M. within a reasonable time. The court based its findings on testimony of several SRS service providers and psychologists, who all believed appellant would be unable to resume full-time parental duties within a reasonable time, and who all believed it to be in M.M.'s best interest to pursue termination of parental rights. The court found this testimony to be credible, and evaluated all testimony and evidence using the clear and convincing evidence standard.
Appellant claims that she had been making improvements in her ability to adequately *1280 care for M.M. The court did find that during the first eighteen months M.M. was in SRS custody, appellant showed some improvement at points and tried to comply with the reunification plan. The court found that although appellant did not show much effort in visiting with M.M. or in attending recommended counselling programs during the spring and summer of 1990, she regularly attended all recommended programs beginning in the fall of 1990, and had weekly visits with M.M. for increasingly longer time intervals. She and M.M. were clearly bonded, and appellant acted appropriately with M.M. during her visits. The court further found that appellant's participation once again slacked off, understandably so, after SRS's decision to pursue TPR, and she missed most visits with M.M. after that time, causing M.M. great distress on at least one occasion.
Although the trial court recognized brief periods of progress in learning to parent M.M., the court concluded that appellant's ability to provide for, care, and protect M.M. either stagnated or deteriorated following any such gains. The court concluded that appellant was unable to provide the necessary environment for M.M.'s well-being, nor did she show promise of being able to do so within a reasonable time. Because these conclusions are amply supported by the record, they must be affirmed.
The second step of the analysis requires consideration of the four factors, as set forth in 33 V.S.A. § 5540, to be used in determining whether M.M.'s best interests mandate termination of all of appellant's parental rights and responsibilities. Section 5540 reads:
At the time of ... a modification hearing under section 5532 of this title ... the court shall consider the best interests of the child in accordance with the following:
(1) The interaction and interrelationship of the child with his natural parents, his foster parents if any, his siblings, and any other person who may significantly affect the child's best interests;
(2) The child's adjustment to his home, school, and community;
(3) The likelihood that the natural parent will be able to resume his parental duties within a reasonable period of time; and
(4) Whether the natural parent has played and continues to play a constructive role, including personal contact and demonstrated love and affection, in the child's welfare.
The most critical factor in determining a child's best interests is whether the parent will be able to resume her parental duties within a reasonable time. In re R.W., 154 Vt. 649, 650, 577 A.2d 253, 253 (1990) (mem.); In re L.A., 154 Vt. 147, 158, 574 A.2d 782, 788 (1990) (interpreting identical provision of prior statute). The parent's inability to resume parental duties within a reasonable time must be shown by clear and convincing evidence. See In re L.A., 154 Vt. at 158-59, 574 A.2d at 788.
Appellant argues that SRS created a "perceived urgency" by placing M.M. with a foster family seeking to adopt, and that this false urgency caused the court to misinterpret the requirement of "reasonable time" under § 5540, and to improperly consider M.M.'s relations with her foster family. We disagree. The court specifically found that a reasonable time had passed and appellant was still at least twelve to eighteen months of counselling away from even being in a position to be considered for reunification. While the court found that appellant had made some progress, each gain was followed by subsequent stagnation or deterioration. Furthermore, the court found that further prolonging the process, especially in light of appellant's lack of a present inclination to participate in the program, would only be to the detriment of M.M., who needs "a caring, safe, and stable environment in which to thrive." These findings were based on ample evidence that the court found to be "clear and convincing."
The court did not err in considering M.M.'s positive relationship with her foster family. The court's findings under § 5540(3) were based upon the testimony of *1281 SRS providers regarding appellant's progress and potential ability to care and protect M.M., and not upon an improper weighing of appellant's ability to care for M.M. versus that of the foster family. A consideration of M.M.'s interactions and interrelations with her foster family was properly considered, however, in evaluating her best interests under subsections (1) and (2) of § 5540, as required by the statute.
Although we uphold the trial court's findings under § 5540 based on these facts and circumstances, we are not unmindful that once a child is placed in SRS custody, SRS "has the power to shape the historical events that form the basis for termination" of parental rights. Santosky v. Kramer, 455 U.S. 745, 763, 102 S.Ct. 1388, 1399, 71 L.Ed.2d 599 (1982). Nor are we unsympathetic to a parent who must successfully jump through a series of hoops in the pursuit of reunification, and who is making some progress, only to have SRS decide to request termination of parental rights after less than eighteen months. But however sympathetic we may be with this teenage mother, who was a child herself when M.M. was born, we are compelled to elevate the best interests of the dependent child above the mother's interests when the mother has made insufficient progress in parenting skills, and when her ability to act independently is many months away.
We caution, however, against the creation of a sense of urgency that may result when SRS places children in need of care and supervision in a potential adoptive home. The potential for adoption cannot serve as the substantial change in material circumstances necessary to warrant modification of an existing disposition. Although the best interests of the child are always the goal, the intent of the statutes is to provide emergency care rather than societal restructuring.
Affirmed.